IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| MAUI LAND & PINEAPPLE COMPANY, INC., | ) ) | CIV. NO. 08-00465 SOM/LEK |
| | ) | |
| Plaintiff, | ) ) | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| vs. | ) ) | WITH RESPECT TO FEDERAL CLAIMS AND DECLINING TO |
| COUNTY OF MAUI, LORI TSUHAKO, in her official capacity as the Director of the Department of Housing and Human Concerns for the County of Maui, and DOE GOVERNMENT OFFICIALS 1-10; and DOE GOVERNMENTAL UNITS 1-10, | ) ) ) ) ) ) ) ) ) | EXERCISE SUPPLEMENTAL JURISDICTION OVER STATE-LAW CLAIMS |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
WITH RESPECT TO FEDERAL CLAIMS AND DECLINING TO EXERCISE
SUPPLEMENTAL JURISDICTION OVER STATE-LAW CLAIMS

I.      INTRODUCTION.

        This court has addressed the merits of the claims

raised in this case in an earlier order.  Now before this court

are competing motions for summary judgment.  Defendants County of

Maui and Lori Tsuhako (collectively, the "County") move for

summary judgment on all claims against them.  Plaintiff Maui Land

& Pineapple Company, Inc. ("MLP"), seeks summary judgment on only

its claim that the Central Resort it plans to develop is exempt

from affordable housing requirements in a County of Maui

ordinance.  The court grants summary judgment to the County on

the federal claims against it and declines to exercise

supplemental jurisdiction over all state-law claims.

II.      BACKGROUND.

        In 1986, MLP contemplated development of a community in
Kapalua, Maui, that would include commercial buildings, hotels,
and homes.  Ex. 11, attached to Pl.'s Concise Statement.  MLP
sought to have the land it wanted to develop designated as a
project district.  Ex. 13, attached to Pl.'s Concise Statement.
Any development within a project district had to be approved in
three phases.

        In Phase 1, the developer had to submit a project
district development application to the Maui Department of
Planning.  The Department of Planning had the job of reviewing
the application and submitting a proposed project district
ordinance detailing the proposed land uses to the Maui Planning
Commission.  MCC § 19.45.050.  The Planning Commission then had
to hold a hearing and submit its recommendations and any proposed
ordinance to the Maui County Council.  Id.  The development had
Phase I approval if the Council passed the ordinance.

        If the ordinance required any agreement between the
County and the developer, the developer had to negotiate the
terms of the bilateral agreement with the Mayor or his designated
representative.  MCC § 19.45.050.  After negotiation but before
execution, the agreement had to be submitted to the Maui County
Council, which could approve it, modify it, or send it back to
the Mayor for further negotiation.  Id.  By law, "Unless

2

otherwise provided in the project district ordinance, no further approvals shall be granted until  . . . all required executed bilateral agreements have been transmitted to the council." Id.

As part of Phase II, after executing any necessary agreement, the developer had to submit a preliminary site plan detailing its development to the Planning Director.  The Planning Director was to forward the site plan to the Planning Commission, which was to hold a public hearing concerning the plan.  The Planning Commission's approval of the site plan would constitute Phase II approval.

In Phase III, the developer had to submit a final site plan to the Planning Director, who would approve it if it conformed in all substantive respects to the approved preliminary site plan. Id.  This approval would constitute successful completion of Phase III.

MLP began the Phase I process in 1986 by submitting its application to the Department of Planning.  Ex. 12, attached to Pl.'s Concise Statement.  In 1987, the Department of Planning analyzed the application and submitted its analysis to the Planning Commission, which then approved MLP's application.  Exs. 13 & 14, attached to Pl.'s Concise Statement.  In 1988, the Maui County Council's Planning and Land Use Committee held a hearing on MLP's application.  Ex. 15, attached to Pl.'s Concise Statement.  Thereafter, in 1989, the Council passed two

3

ordinances, which meant that MLP's development had Phase I approval.

The first 1989 ordinance set standards for the area MLP proposed to develop, an area the County designated as Lahaina Project District 1 ("LPD 1").  Ord. 1844 (1989); MCC §§ 19.73.010-19.73.100 (1989).  The second 1989 ordinance rezoned approximately 211 acres of land on Maui as falling in the "PD-LAH/1 Project District."  Ord. 1845 (1989).  The Council required anyone developing in LPD 1 to enter into an agreement with the County to "develop an affordable housing program, for residents of West Maui, provided that development other than hotel development within the project may proceed before the agreement has been executed."  MCC § 19.73.100(A)(2).

After the Council had passed the two ordinances, but before an agreement with the County had been executed, MLP sought Phase II approval for building the Ritz Carlton Hotel in LPD 1. MLP obtained Phase II approval in 1990, and construction of the hotel was completed in 1992.  Ex. E, attached to Def.'s Concise Statement.

In 2004, MLP submitted a proposed Bilateral Agreement describing the affordable housing requirements relating to its development in LPD 1 to the Council.  The Planning and Land Use Committee held a hearing, then sent the Bilateral Agreement to the Mayor for approval.  Ex. 19, attached to Pl.'s Concise

Statement; Ex. H, attached to Def.'s Concise Statement.  In December 2004, the Mayor and MLP executed the Bilateral Agreement.  Ex. C, attached to Def.'s Concise Statement.

This "Bilateral Agreement for Development and Coordination of an Affordable Housing Program" required MLP to "provide affordable housing . . . in accordance with the affordable housing policy and requirements set forth in chapter 2.94 of the Maui County Code."  Id.  The Bilateral Agreement further stated that, "when hotel development in Lahaina Project District 1 (Kapalua) that is subject to Chapter 2.94 is proposed, the affordable housing proposed with respect to such development shall be reflected in a recorded agreement in accordance with Section 2.94.030.D, Maui County Code."  Id.  The Bilateral Agreement also described chapter 2.94 as "implement[ing] an affordable housing construction program applicable to hotel developments."  Id.

Chapter 2.94 was titled "Affordable Housing Policies for Hotel-Related Developments."  MCC § 2.94.010 (repealed in 2006).  The chapter required "apartment-hotel, hotel and motel developers" to construct affordable housing units in connection with their developments.  Id.  A developer was "required to construct affordable housing at a minimum of one affordable housing unit for every four apartment-hotel, hotel or motel rooms."  MCC § 2.94.030.

Neither the 2004 Bilateral Agreement nor the 1989 ordinances explicitly referred to any requirement to provide affordable housing in connection with any residential development.

In 2006, the County passed an ordinance called the "Residential Workforce Housing Policy."  This ordinance addresses affordable housing requirements applicable to "[a]ny development, including the subdivision of land and/or the construction of single family dwelling units."  MCC § 2.96.030.  It requires a developer with a project subject to this chapter to sign a residential workforce housing agreement with the County.  MCC § 2.96.040.  Under the residential workforce housing agreement, the developer must rent or sell forty to fifty percent of the total number of developed units to low-income individuals when selling fifty percent or more of the units it develops.  MCC § 2.96.040(A).  The requirements do not apply to a development that "is subject to an affordable housing requirement, evidenced by an executed affordable housing agreement with the County, currently in effect and approved prior to the effective date of the chapter," or that "is subject to a change in zoning condition that requires affordable or residential workforce housing."  MCC §§ 2.96.030(B)(1)-(2).

After the ordinance went into effect, on December 6, 2006, MLP sent a letter to the Maui Department of Housing and

Human Concerns ("DHHC") seeking clarification that its development within LPD 1 was exempt from the 2006 ordinance. MLP, which hoped to develop what it was calling its Central Resort Project within LPD 1, asserted in its letter, "Since Lahaina Project District 1 is subject to a change in zoning condition requiring affordable housing and no other housing policy applies, the development is exempt pursuant to Section 2.96.030B.2 of the Maui County Code." Ex. 8, attached to Pl.'s Concise Statement.  MLP asked the DHHC Director and the Mayor to "countersign this letter [to indicate] agreement with the above analysis and our conclusion that the exemption applies." Id.  On December 12, 2006, the DHHC Director and the Mayor signed the letter.  Id.

Thereafter, a new Mayor was elected and named a new cabinet.  On March 28, 2007, the new DHHC Director notified the Department of Planning that the previous administration had agreed that MLP's Central Resort Project, a project including homes and residences built around a central village core, was exempt from the 2006 ordinance.  Ex. 9, attached to Pl.'s Concise Statement.  On April 11, 2007, the DHHC Director notified the Department of Planning that, contrary to what the former administration had stated, MLP's Central Resort Project was indeed subject to the requirements of the 2006 ordinance.  Ex. 10, attached to Pl.'s Concise Statement.

On June 26, 2007, the Planning Commission held a
hearing to discuss whether to grant MLP's Central Resort Project
Phase II approval.  Ex. I, attached to Def.'s Concise Statement.
At this meeting, MLP represented that it would allocate forty
percent of the units it developed for workforce housing.  Id. at
92.  The Planning Commission approved the project on the
condition that, "as represented by the applicant, a voluntary
provision of at least 40% of workforce housing units shall be
provided."  Ex. R, attached to Def.'s Concise Statement.

On July 7, 2007, the Department of Planning sent MLP a
letter detailing conditions for the Central Resort Project.  The
letter stated that MLP had to begin construction by June 30,
2010, and further stated that "should a determination be made
that a workforce housing requirement of 50% is applicable, the
applicant shall provide said 50%."  Ex. R, attached to Def.'s
Concise Statement.  On July 31, 2008, the DHHC advised the
Planning Commission that MLP was not exempt from the requirements
of chapter 2.96, passed in 2006, and that the fifty percent
requirement was applicable.  Ex. S, attached to Def.'s Concise
Statement.

In 2008, MLP filed the present action, asserting
various claims and contending that its Central Resort Project was
exempt from the 2006 ordinance.  In August 2009, MLP moved for
summary judgment on its claim that its development within LPD 1

8

was exempt from the 2006 ordinance and on its claim that the 2006 ordinance violated the Contracts Clause.  The court denied the motion on the ground that MLP had not met its burden of demonstrating that it was entitled to summary judgment.  See Maui Land & Pineapple Co., Inc. v. County of Maui, 2009 WL 3460780, at *3 (D. Haw. Oct. 27, 2009).  The County now moves for summary judgment on all of MLP's claims, and MLP renews its motion for summary judgment on only its claim that its Central Resort Project is exempt from the requirements of the 2006 ordinance.

III.      SUMMARY JUDGMENT STANDARD.

        Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (effective Dec. 1, 2009).

        One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).  On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor."  Id. (quotations and brackets omitted).

9

When the party moving for summary judgment would bear the burden of proof at trial, it also bears "the initial burden of establishing the absence of a genuine issue of material fact" on each issue material to its case. <u>Glenn Miller Prods., Inc.</u>, 454 F.3d at 987 (internal quotations omitted). A material fact is one that could affect the outcome of the suit under the governing substantive law. <u>Id.</u>

When the moving party fails to carry its initial burden, "the nonmoving party has no obligation to produce anything." <u>Nissan Fire & Marine Ins. Co. v. Fritz Co., Inc.</u>, 210 F.3d 1099, 1102-03 (9th Cir. 2000). "In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything." <u>Id.</u>

If, however, the moving party meets its burden, the burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. <u>Glenn Miller Prods., Inc.</u>, 454 F.3d at 987. The nonmoving party may not rely on the mere allegations in the pleadings but instead "must set forth specific facts showing that there is a genuine issue for trial." <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005) (internal quotations omitted). However, summary judgment should not be granted "where contradictory inferences may be drawn from undisputed evidentiary facts." <u>United States v. Perry</u>, 431 F.2d 1020, 1022 (9th Cir. 1970).

Only when the evidence "could not lead a rational trier of fact to find for the nonmoving party" may a court properly grant summary judgment.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (internal quotation omitted).

IV.      <u>ANALYSIS.</u>

      A.      <u>This Court Grants the County Summary Judgment On MLP's Contracts Clause Claim (First Claim for Relief).</u>

In its First Claim for Relief, MLP alleges that application of the 2006 ordinance to its Central Resort Project would violate the Contract Clause of the United States Constitution.  The Contract Clause states, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I § 10, cl. 1.  Whether a regulation violates the Contract Clause is governed by a three-step inquiry, as this court explained in its previous order.  <u>See Maui Land & Pineapple Co., Inc.</u>, 2009 WL 3460780, at *5.  First, the court must determine "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship."  <u>RUI One Corp. v. City of Berkeley</u>, 371 F.3d 1137, 1147 (9th Cir. 2004) (internal quotations omitted).  Second, the court must decide whether the state a "significant and legitimate public purpose behind the regulation."  <u>Id.</u>  Third, the court must inquire "whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of

a character appropriate to the public purpose justifying the legislation's adoption." Id.

This court concludes that MLP cannot sustain its Contract Clause claim because it does not survive the first inquiry, which asks whether the law in issue operates as a substantial impairment of a contractual relationship.  This conclusion makes it unnecessary for the court to consider the other two inquiries.

The threshold inquiry that MLP cannot survive has three components: "whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." Id. (internal quotations omitted).  As this court noted in its prior order, the first component concerns not whether any contractual relationship exists between the parties, but whether, as the Supreme Court puts it, there is a "contractual agreement regarding the specific . . . terms allegedly at issue." General Motors Corp. v. Romein, 503 U.S. 181, 187 (1992).  "The question of whether a contract was made is a federal question for purposes of Contract Clause analysis." Id.

A contractual agreement can be express or implied.  To maintain a Contract Clause claim based on an implied term, the term must be "central to the bargained-for exchange between the parties, or to the enforceability of the contract as a whole."

12

Id. at 182.  The "contracting parties must manifest assent" to such a term.  RUI One Corp., 371 F.3d at 1148.  In considering whether an implied term is in issue here, this court keeps in mind the maxim that implied terms that create governmental contractual obligations or limit governmental authority are disfavored.  See United States v. Winstar Corp., 518 U.S. 839, 874-75 (1996) (explaining a canon of construction that states that implied governmental obligations in public contracts are disfavored); see also Madera Irrigation Dist. v. Hancock, 985 F.2d 1397, 1401 (9th Cir. 1993) (noting that a court must construe a contract with the government to avoid, if possible, foreclosing the exercise of sovereign authority) (internal quotations omitted).

MLP says that the parties intended that the Bilateral Agreement cover all of MLP's affordable housing requirements in connection with any development it proceeded with in LPD 1. Pointing to this court's prior denial of summary judgment, to the legislative history of the 2006 ordinance, and to the course of dealing between the parties, MLP argues that there are triable issues of fact concerning the scope and intent of the Bilateral Agreement that preclude summary judgment on the Contract Clause claim.  This court disagrees with MLP on this point.

1.      This Court's Prior Ruling Does Not
Preclude Summary Judgment on the
Contract Clause Claim on the
Present Record.

In denying summary judgment on the Contract Clause claim in its prior ruling, this court noted that the Bilateral Agreement might be ambiguous.  Maui Land & Pineapple Co., 2009 WL 3460780, at *8 ("At most, the Bilateral Agreement might be said to be ambiguous as to whether the parties intended it to be an affordable housing agreement covering all of MLP's developments within LPD 1.").  MLP argued that the Bilateral Agreement required MLP to provide affordable housing only when developing a hotel, but the court found that MLP had not met its burden of establishing that point.  In its present summary judgment motion, the County argues that the Bilateral Agreement is not ambiguous at all, instead clearly leaving open the possibility that there would be future affordable housing requirements imposed on MLP in connection with future development.  Even if, as MLP argues, the Bilateral Agreement is ambiguous, MLP's Contract Clause claim fails.

In its prior order, this court cited Hawaii law for the proposition that "[a]n ambiguity relating to the intent of the parties is not a matter susceptible to summary judgment."  Maui Land & Pineapple Co., 2009 WL 3460780, at *4 (citing Found. Int'l Inc. v. E.T. Ige Const., 102 Haw. 487, 497, 78 P.3d 23, 33 (2003)).  MLP now quotes this statement back to this court seeking to fend off summary judgment.  The problem for MLP is

that it bears the burden of proving up its claims, and, if it
cannot make some showing of how it will meet that burden at
trial, it is not entitled to go to trial.  That is, while a
genuine dispute about intent cannot be resolved through the
summary judgment process, a mere assertion of intent does not
create a genuine dispute.  In short, on the present motions, MLP
presents no triable issue as to intent.

It is now several months after the court's prior
ruling, and MLP tellingly still makes no showing of what facts it
would present at trial tending to show that the parties
manifested assent to an agreement limiting MLP's affordable
housing obligations to hotel development.  Having had ample time
to conduct discovery to gather evidence, MLP presents only some
legislative history and an after-the-fact letter signed by County
officials.  None of this raises any factual issue.

2.      The Legislative History Does Not
        Create a Factual Issue.

Comments by individual legislators rarely create
factual issues to present to factfinders.  This court has
previously stated:

> If every legislator could be said to speak
> on behalf of the state with regard to every
> piece of legislation, there could be no
> cogent state voice.  It is the collective
> legislature, as it votes on each piece of
> legislation, that decides the collective
> voice of the state.  Legislators inevitably
> have contradictory opinions and viewpoints
> on different bills.  They speak for the

15

> state through the bills they act on, and it
> is only through the bills that they pass
> that they can be said to speak for the
> state.  When a bill passes, individual
> legislators who explain their votes must be
> seen as speaking only for themselves.  If
> the explanations were contemporaneous with
> consideration of the bill, and if they are
> offered in admissible form, then, as this
> court noted in considering the floor
> debates, such evidence may be considered,
> but even then only as explaining, at best,
> those particular legislators' votes.

Bennett v. Yoshina, 98 F. Supp. 2d 1139, 1154 (D. Haw. 2000),

aff'd on other grounds, Bennett v. Yoshina, 259 F.3d 1097 (9th

Cir. 2001).

With this concern in mind, the court turns to MLP's

reliance on a discussion during a Planning and Land Use Committee

hearing held in March 2004, nine months before the Bilateral

Agreement was executed.  MLP says that this discussion is

evidence that the County and MLP intended that the Bilateral

Agreement cover all of MLP's affordable housing obligations in

connection with any development by MLP within LPD 1.  During this

hearing, MLP discussed the Bilateral Agreement's scope and

effect:

> MR. CHURCHILL [of MLP]: We have -- I believe
> we have a strong history of providing
> housing to our employees and the community
> and we've, you know -- like Kapua Village,
> we haven't sought out any employee housing
> or affordable housing credits on that
> project, the 45 units.  It's just something
> the company has done over the years.

16

COUNCILMEMBER JOHNSON: Okay.  And with
regard, though, your other units that you've
[built at Pineapple Hill].

. . . .

COUNCILMEMBER JOHNSON: And then any of the
other single family things that you have
built in that area or multi-family, those at
that point in time, then, had no requirement
to build affordable housing or is it just
that that has not been addressed within its
unilateral and bilateral agreement?

MLP: Correct, it had no requirement.

Ex. 19, attached to Pl.'s Concise Statement.  This exchange

demonstrates only that MLP's completed non-hotel developments

were not subject to any affordable housing requirement, not that

future non-hotel development in LPD 1 was exempt from

requirements that the County might later impose.

Nor is an exchange in 1988, before the Council had

passed its two 1989 ordinances, any more helpful to MLP.  At a

hearing in 1988 before the Planning and Land Use Committee, a

councilmember asked MLP about its housing obligations.  MLP

explained that MLP could build non-hotel developments before

building affordable housing, and that, if it decided to "do a

hotel, and when we do the hotel, we have to sign this bilateral

agreement, and we have to develop housing for the hotel."  Ex. 15

at 12, attached to Pl.'s Concise Statement.  The councilmember

replied, "[T]here lies my concern, the fact that I'd much rather

see you provide the housing there prior to, or in conjunction

17

with the other amenities besides the hotel." _Id._  MLP responded
that "we will be back before you to request zoning changes and
approvals for apartment projects and the single family project."
_Id._ at 13.  This dialogue reflecting MLP's recognition that it
needed to obtain approval before building homes or apartments
suggests that MLP understood that it could be subject to further
housing demands before getting approval.

        More importantly, a review of the history in issue
indicates that the Bilateral Agreement signed in 2004 was a
"housekeeping measure."  One of the 1989 ordinances required MLP
to execute the Bilateral Agreement setting forth MLP's affordable
housing program relating to hotel development.  MLP built the
Ritz Carlton in 1990 and provided the required affordable housing
relating to that hotel years before it executed the Bilateral
Agreement in 2004.  Both MLP and the County say that the
Bilateral Agreement was signed as an after-the-fact reflection of
MLP's compliance with the 1989 ordinance.  This is consistent
with a councilmember's statement that the Bilateral Agreement
"just formalizes the fact that [MLP had abided by the 1989
ordinance requirements]."  Ex. 19 at 117, attached to Pl.'s
Concise Statement.  Even MLP states that the County "was fully
aware that MLP had already fulfilled its affordable housing
requirements imposed by the 1989 ordinances" when the County
contemplated the Bilateral Agreement.  Motion at 19.  If the

18

parties intended the Bilateral Agreement to reflect that MLP had fulfilled the 1989 ordinance requirement to develop an affordable housing program in connection with hotel development,[1] then this court fails to see how the Bilateral Agreement was supposed to prohibit the County from creating affordable housing requirements relating to MLP's future developments.

Additionally, language from a Committee Report shows that the parties did not intend that this Bilateral Agreement would cover all of MLP's future development. In May 2004, the Planning and Land Use Committee recommended approval of the Bilateral Agreement. The Committee reported:

> Under the bilateral agreement to establish
> an affordable housing program, ML&P will be
> deemed to have satisfied its obligation
> under [the 1989 ordinance] to provide for an
> affordable housing program for the Ritz-
> Carlton Hotel through the employee housing
> provided by ML&P under the November 27, 1984
> agreement (Hale Noho) and the 38-lot
> Honokeana residential subdivision. With
> respect to any *future hotel development*
> within the Project District, ML&P would
> provide affordable housing with respect to
> Lahaina Project District 1 (Kapalua) in
> accordance with the affordable housing
> policy and requirements set forth in Chapter
> 2.94, Maui County Code.

---

[1] The County allowed the after-the-fact Bilateral Agreement notwithstanding the provision in the Maui Code stating that no Phase II approval should precede execution of such an agreement. MLP received Phase II approval for the hotel in 1990, and the Bilateral Agreement was executed in 2004.

Ex. O, attached to Def.'s Concise Statement (italics added, citations omitted).  This report suggests that the Bilateral Agreement contemplated compliance by MLP with whatever requirements were applicable by law to future developments.

Thus, the legislative history, far from establishing a triable issue, provides no evidence that the parties agreed that the Bilateral Agreement would cover all of MLP's affordable housing obligations for all time within LPD 1.

3.       The Parties' Subsequent Conduct
         Does Not Create a Triable Issue.

As additional evidence of the parties' purported agreement that MLP was obligated to provide affordable housing only when it developed hotels, MLP points to a single letter countersigned by the Mayor and the DHHC Director.  The letter stated, "[S]ince Lahaina Project District 1 is subject to a change in zoning condition requiring affordable housing and no other housing policy applies, the development is exempt pursuant to Section 2.96.030.B.2."  Ex. 8, attached to Pl.'s Concise Statement.  This letter does not create a question of fact as to whether the parties agreed to limit MLP's affordable housing obligations.

The court notes at the outset that whether MLP's developments are exempt from the 2006 Ordinance is a separate issue from whether the parties intended, in the 2004 Bilateral Agreement, to limit MLP's affordable housing obligations to hotel

20

development.  Not only was the letter signed two years after the
Bilateral Agreement, the countersignatures in 2006 on a letter
providing that an exemption applied appears to have been entirely
independent of the 2004 Bilateral Agreement.  The 2006 letter
discusses the construction, interpretation, and application of
the 2006 ordinance.  In countersigning the 2006 letter drafted by
MLP, the Mayor and the DHHC Director stated only, "Agreed on
application of exemption."  They did not indicate a belief that
the exemption was made applicable by an implied term in the
Bilateral Agreement.  MLP may have intended to suggest that
connection in drafting the letter, but the countersignatures in
no way adopt that suggestion.

        The Mayor and the DHHC Director could have seen an
exemption to the 2006 ordinance as applicable because, as MLP
expressly claimed in its 2006 letter, LPD 1 was subject to a
change in zoning condition requiring affordable housing and
because no other housing policy applied.  If that change in
zoning condition flowed from passage of ordinances in 1989, that
change took effect more than a decade before the Bilateral
Agreement was signed in 2004.  In that event, the change in
zoning condition that allegedly justified application of an
exemption to the 2006 ordinance was independent of the Bilateral
Agreement, and the 2006 letter is irrelevant to any implied term
in the Bilateral Agreement.

At the hearing on the present motions, MLP argued that this court should look to state law to determine the existence of a contract, and that Hawaii law allows official assurances to form the basis of an implied contract or an implied term of a contract.  But whether a contract was made on the specific terms at issue is a federal question for purposes of Contract Clause analysis, and "whether it turns on issues of general or purely local law, [the court] cannot surrender the duty to exercise [its] judgment."  Romein, 503 U.S. at 187 (internal citations omitted); Hawkeye Commodity Promotions, Inc. v. Vilsak, 486 F.3d 430, 437 (8th Cir. 2007) (noting that the parties incorrectly assumed the existence of a contract is governed by state law, when it is a federal question of whether a contract was made); Liberty Mut. Ins. Co. v. Whitehouse, 868 F. Supp. 425, 430 (D.R.I. 1994) (noting that "whether such an agreement exists is a question that must be determined under federal law").

When a plaintiff alleges that an implied term is impaired, the plaintiff must demonstrate that the parties manifested assent to such a term and that the term is so central to the bargained-for exchange between the parties, or to the enforceability of the contract as a whole, that it must be deemed to be a term of the contract.  See Romein, 503 U.S. at 187; RUI One Corp., 371 F.3d at 1148-49.  A plaintiff can make this

showing by establishing a clear course of dealing between the parties indicating that the parties agreed on the term.

Such a course of dealing was in issue in <u>University of Hawaii Professional Assembly v. Cayetano</u>, 183 F.3d 1096, 1099 (9th Cir. 1999).  That case involved a Hawaii law authorizing a "pay lag." The State of Hawaii was permitted by the statute to postpone the dates on which state employees received their salaries.  The employees' collective bargaining contract contained no express requirement regarding specific payroll dates.  However, twenty-five years of payments on the fifteenth day and the last day of each month, and Hawaii law stating that wages and the payment of wages are a mandatory subject of negotiation, demonstrated that the collective bargaining agreement contained an implied term.  <u>Id.</u>  The court looked to Hawaii law to shed light on whether the parties had assented to an implied term.  Under Hawaii law, a course of dealing could create a contractual expectation.  183 F.3d at 1101.  As the time for paying wages was something that had to be negotiated, and as the parties had a course of dealing that clearly established payment on certain dates, the court concluded that the collective bargaining agreement included an implied term to that effect. While the Ninth Circuit consulted Hawaii law for guidance in examining the parties intent, federal law controlled the discussion as to whether the parties had manifested assent or

23

contractually agreed to an implied term.  See RUI One Corp., 371 F.3d at 1148-49.

Similarly, in Southern California Gas v. City of Santa Ana, 336 F.3d 885, 890 (9th Cir. 2003) (per curiam), a gas utility challenged a municipal ordinance that required advance payment by anyone who wanted to perform an excavation.  The gas utility had an agreement to lay pipes under city streets.  The agreement did not explicitly state that the utility could perform such work without paying the city before doing so.  The court stated that the utility's history of performing "thousands" of patched trenches without paying fees supported the conclusion that the utility had a right to excavate without prepayment.  Id. at 891-92.

MLP presents no evidence of a course of dealing indicating that the parties agreed to an implied contractual term.  Even assuming this court should look to state law on this subject, MLP is unpersuasive.  MLP is arguing that official assurances in 2006 are evidence of the existence of an implied term in a 2004 agreement.  But the assurances in issue are of questionable import.  Neither the DHHC Director nor the Mayor had the authority to exempt MLP's developments from any housing condition.  MLP did not have Phase II approval for its Central Resort Project either before the 2006 ordinance was passed or at the time the DHHC Director and Mayor signed the letter.  It was

24

only the Planning Commission, not the DHHC Director or the Mayor, that had the power to approve, disapprove, or set conditions for approval of any specific project in a project district.  MCC § 19.45.050.  It is difficult to see how the DHHC Director or the Mayor could exempt a developer from any requirement relating to a project that had not even been approved, especially when the approving authority had the sole power to fashion conditions for approval.

In a similar case, the Hawaii Supreme Court held that a developer could not rely on the assertions of the Planning Director regarding setback lines for the developer's project, when the authority to establish setback lines rested with the Planning Commission, not the Planning Director.  Brescia v. North Shore Ohana, 115 Haw. 477, 500, 168 P.3d 929, 952 (2007).  The court noted, "Agents of the government must act within the bounds of their authority; and one who deals with them assumes the risk that they are so acting."  Id. (internal quotations omitted).

As the Mayor and the DHHC Director lacked the authority in 2006 to limit MLP's affordable housing obligations, this court is at a loss to see how their signatures on that subject could legitimately support binding the County to an implied contractual term in an agreement signed two years earlier.

25

The court stresses that its discussion concerns only the Contract Clause analysis.  The court is limiting itself here to a review of the record for evidence of assent to an implied term.  The court concludes that MLP does not present evidence of the assent necessary to justify reading an implied term into the Bilateral Agreement.  This means that MLP does not show that the 2006 ordinance impaired a term of the 2004 Bilateral Agreement. The court grants the County summary judgment with respect to the Contract Clause claim.

B.      The Court Grants the County Summary Judgment on MLP's Claims That the County Violated MLP's Due Process Rights Under the United States Constitution (Second and Third Claims for Relief).

The court turns next to MLP's claims that its due process rights were violated by enactment and application of the 2006 ordinance.  MLP complains that it has property interests arising from the Bilateral Agreement.  The County argues that no property interest arose from this contract.  This court agrees with the County.

The Fifth and Fourteenth Amendments to the United States Constitution provide that a person may not be deprived of life, liberty, or property without due process of law.  The Due Process Clause confers both procedural and substantive rights. Richardson v. City & County of Honolulu, 124 F.3d 1150, 1162 (9th Cir. 1997) (citing United States v. Salerno, 481 U.S. 739, 746

26

(1987)).  These guarantees apply only when a constitutionally

protected liberty or property interest is at stake;

demonstrating the existence of such an interest is a threshold

requirement to a due process claim.  See Carver v. Lehman, 558

F.3d 869, 872 (9th Cir. 2009) ("Our analysis of due process

claims proceeds in two steps.  The first asks whether there

exists a liberty or property interest which has been interfered

with by the State; the second examines whether the procedures

attendant upon that deprivation were constitutionally

sufficient.") (internal citations omitted); see also Bd. of

Regents v. Roth, 408 U.S. 564, 569 (1972); Action Apartment Ass'n

v. Santa Monica Rent Control Bd., 509 F.3d 1020 (9th Cir. 2007)

(noting that a "substantive due process claim 'must, as a

threshold matter, show a government deprivation of life, liberty,

or property'") (quoting Nunez v. City of Los Angeles, 147 F.3d

867, 871 (9th Cir. 1998)).

        MLP fails to demonstrate that it has a

constitutionally protected property interest arising from the

2004 Bilateral Agreement.  Property interests are "existing rules

or understandings that stem from an independent source such as

state law-rules or understandings that secure certain benefits

and that support claims of entitlement to those benefits."  Roth,

408 U.S. at 577.  MLP says the Bilateral Agreement "is the

property interest," but this argument presupposes that the

27

"Bilateral Agreement covered all development within LPD 1."
Opposition at 20.  Given MLP's failure to produce evidence
showing that the Bilateral Agreement covered all of its
developments within LPD 1, MLP cannot show that it has any
protected property interest arising from the Bilateral Agreement.
Accordingly, this court grants the County summary judgment on
MLP's due process claims, set forth in the Second and Third
Claims for Relief.

        C.        The Court Declines Supplemental Jurisdiction
                over the State-Law Claims.

      The court's rulings on the federal claims leaves the
state-law claims pending, including the one claim on which MLP
moved for summary judgment.  When "the federal claims are
dismissed before trial, even though not insubstantial in a
jurisdictional sense, the state claims should be dismissed as
well." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).
Although such a dismissal is not "a mandatory rule to be applied
inflexibly in all cases," it has been said that, "in the usual
case in which all federal-law claims are eliminated before trial,
the balance of factors to be considered under the pendent
jurisdiction doctrine--judicial economy, convenience, fairness,
and comity--will point toward declining to exercise jurisdiction
over the remaining state-law claims." Carnegie-Mellon Univ. v.
Cohill, 484 U.S. 343, 350 n.7 (1988).

Because the state-law claims predominate over the federal claims, and because this court has dismissed the claims over which it had original jurisdiction, the court declines to exercise supplemental jurisdiction over the remaining claims. Those state-law claims are therefore dismissed without prejudice to any filing in state court that may be appropriate under state law.  This ruling obviates the need for this court to address the other claims in the County's or MLP's motion for summary judgment, and this court expresses no view on whether MLP has a viable claim under the Hawaii constitution, whether the Central Resort Project falls within any exemption to the 2006 ordinance, whether the County is equitably estopped from imposing affordable housing requirements on MLP in connection with the Central Resort Project, or whether MLP should prevail on any other state-law claim.  This court is only ruling that MLP cannot proceed here under the federal Contract Clause or Due Process Clause, as MLP has not proffered evidence in the record before this court that the parties assented to a term in the Bilateral Agreement, express or implied, that limited MLP's affordable housing obligations throughout LPD 1 to hotel development.

V.        CONCLUSION.

This court grants the County summary judgment with respect to the First, Second, and Third Claims for Relief.  The court dismisses without prejudice the remaining claims, which are

29

all state-law claims.   The Clerk of Court is ordered to enter

judgment for Defendants and to close the case.


IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 31, 2010




    /s/ Susan Oki Mollway
    Susan Oki Mollway
    Chief United States District Judge


Maui Land & Pineapple Co., Inc.,  v. County of Maui, et al, Civil
No. 08-465 SOM/LEK; Order Granting Defendants' Motion For Summary
Judgment With Respect to Federal Claims and Declining to Exercise
Supplemental Jurisdiction Over State-Law Claims.